IN THE UNITED STATES DISTRICT COURT
FOF THE SOUTHERN DISTRICT OF OHIO

MATTHEW DAVIS and JEANETTE DAVIS,

    Plaintiffs,

    v.                                                                                    Civil Action No.:2:22-cv-3516

GCS WATER PURIFICATION, LLC a/k/a
ALESNA LLC, a Texas Limited Liability Company,
KEURIG DR. PEPPER INC.,
a Delaware Corporation,
KEURIG DR PEPPER HOLDINGS INC.,
a Delaware Corporation, and
STERLING PROCESS EQUIPMENT AND
SERVICES, INC., an Ohio Corporation,

    Defendants.

## COMPLAINT

**COME NOW** Plaintiffs Matthew Davis and Jeanette Davis ("Plaintiffs") and state as follows for their *Complaint* ("Complaint") against Defendants:

## PARTIES

1. Plaintiff Matthew Davis is a resident and citizen of Putnam County, West Virginia. At all relevant times, Mr. Davis was employed by Defendant GCS Water Purification, LLC and worked for Defendant GCS Water Purification, LLC out of Hurricane, Putnam County, West Virginia; and, received West Virginia workers' compensation coverage from Defendant GCS Water Purification, LLC a/k/a Alesna LLC.

2. Plaintiff Jeanette Davis is a resident and citizen of Putnam County, West Virginia.

3. Defendant GCS Water Purification, LLC a/k/a Alesna LLC ("GCS") is a Texas limited liability company with membership residing in the state of Texas. At all relevant times, GCS was engaged in the business of water purification services, which included installation of

1

water purification equipment. When engaged in the business of installing water purification equipment, GCS was subject to the jurisdiction of the federal Occupational Safety and Health Administration (hereinafter "OSHA") and was responsible for compliance with all applicable OSHA rules and regulations in connection therewith. At all relevant times, GCS employed Mr. Davis in Hurricane, West Virginia; maintained a location at 158 Washington Hill Road, Hurricane, West Virginia 25526 from which it conducted business; and, maintained West Virginia workers' compensation coverage via Argonaut Insurance Company, Policy No. WC928708681004, such that Mr. Davis received West Virginia workers' compensation coverage in connection with the incident giving rise to this *Complaint*.

4. Defendant Keurig Dr. Pepper Inc. is a Delaware corporation with its principal place of business located in Plano, Texas. At all relevant times, Keurig Dr. Pepper Inc. owned and operated a manufacturing plant at 960 Stelzer Road, Columbus, Ohio 43219 (the "Plant"). As such, Keurig Dr. Pepper Inc. was subject to OSHA's jurisdiction and was responsible for compliance with all applicable OSHA rules and regulations in the operations associated therewith.

5. Defendant Keurig Dr. Pepper Holdings Inc. (collectively with Keurig Dr. Pepper Inc., "Dr. Pepper") is a Delaware corporation with its principal place of business located in Plano, Texas. At all relevant times, Keurig Dr. Pepper Holdings Inc. owned and operated the Plant. As such, Keurig Dr. Pepper Holdings Inc. was subject to OSHA's jurisdiction and was responsible for compliance with all applicable OSHA rules and regulations in the operations associated therewith.

6. Sterling Process Equipment and Services, Inc. ("Sterling") is an Ohio corporation with its principal place of business in Columbus, Franklin County, Ohio. At all relevant times, Sterling was engaged in the business of designing, engineering, fabricating and selling custom

metalworks to for various industrial purposes. As such, Sterling was subject to OSHA's jurisdiction and was responsible for compliance with all applicable OSHA rules and regulations in the operations associated therewith.

**JURISDICTION AND VENUE**

7. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, insofar as Plaintiffs and Defendants are residents of different states and the amount in controversy in this matter exceeds $75,000.00.

8. Venue is appropriate pursuant to 28 U.S.C. § 1391(b)(1), insofar as Sterling is a resident of the State of Ohio and, furthermore, resides in Franklin County, Ohio which is within this judicial district. Venue is further appropriate because a substantial part of the events or omissions giving rise to the claim occurred in Franklin County, Ohio, which is within this judicial district. *See* 28 U.S.C. § 1391(b)(2).

**FACTS**

9. On or about October 28, 2021, and in the course of his employment with GCS, 34-year-old Mr. Davis was dispatched from his GCS base of operations in Hurricane, Putnam County, West Virginia to perform temporary maintenance and installation work in Columbus, Franklin County, Ohio. Mr. Davis traveled from Hurricane, Putnam County, West Virginia and met his immediate supervisors, Joel Alesna and Jake Alesna, in Columbus to install a new 1,500-pound water pump ("Pump") in an existing reverse osmosis ("RO") system in the Dr. Pepper Plant. This job was one of GCS's attempts to secure more consistent business from Dr. Pepper.

10. To align the new Pump with the RO system, the new Pump needed to be elevated. Dr. Pepper contracted with Sterling to design, engineer and fabricate a metal stand on which the new Pump was to be secured (the "Stand"). Sometime prior to October 28, 2021, Sterling

engineers came to the site, took measurements and drawings, and gathered information necessary to fabricate the Stand. Upon information and belief, Sterling ultimately fabricated an angle iron stand, all thread, with wobble feet on the bottom. Furthermore, upon information and belief, Sterling either knowingly or recklessly produced the Stand in a manner that did not comport with the specifications and requirements thereof with

11. On October 28, 2021, Mr. Davis traveled from Hurricane, Putnam County, West Virginia to accompany Messrs. Alesna and install the Pump at the Plant, accompanied by several Dr. Pepper personnel including maintenance supervisor Hassan. After viewing the stand, Mr. Davis voiced concern to Messrs. Alesna that the Stand would not be adequate to support the Pump. Despite Mr. Davis expressing his concerns, Jake Alesna directed Mr. Davis to proceed with the installation process and took no action to evaluate whether those concerns had merit.

12. GCS personnel attached the Pump to the Stand outside the plant near an elevated entryway. Once the Pump was affixed to the Stand, GCS and/or Dr. Pepper personnel secured the Pump and Stand apparatus to a forklift with chains through the Pump's lifting eyes, simple metal loops which allow for the Pump to be secured without potentially damaging the components in transit.

13. Once secured to the Stand, the Pump was elevated into the Plant entryway and moved 6 feet forward. The forklift—still outside—could not advance further.

14. Due to safety concerns about the stability of the Stand, Mr. Davis asked Dr. Pepper Maintenance Supervisor Hassan for a second fork truck, which would ensure that the Pump and Stand remained supported until placed in its intended location. Mr. Hassan denied Mr. Davis this safety measure.

15. With no other option, Mr. Davis and others unhooked the Pump and Stand from the fork truck, leaving the full weight of the Pump on the Stand. Meanwhile, the original fork truck was brought around and into the Plant, so that the Pump and Stand could be resecured to it and transported to the intended location.

16. As the fork truck approached, Mr. Davis and a Dr. Pepper employee observed that the fork truck would not be able to properly align with the Pump and Stand; had the forks approached the Pump and Stand at that angle, the forks would have damaged electrical components on the Pump. Mr. Davis and a Dr. Pepper employee attempted to rotate the Pump and Stand.

17. During this attempt to slightly rotate the Pump and Stand, one of the legs of the Stand snapped off. Before Mr. Davis had an opportunity to react and avoid it, the Pump fell on Mr. Davis' left leg, crushing it.

18. As a direct and proximate result of this incident, Mr. Davis suffered multiple injuries, including (1) detachment of his heel from the remainder of his foot; (2) multiple fractures to the femur, tibia and fibula; (3) multiple knee injuries; and, (4) a broken thumb. As a result of his injuries, Mr. Davis underwent surgery to install a rod through his knee to stabilize the leg bones and reattach his heel. He subsequently spent 3 to 4 months in a wheelchair, followed by several months with a cane. The substantial majority of this treatment ultimately took place in West Virginia.

19. As a further direct and proximate result of this incident, Mr. Davis, a West Virginia resident, suffers from permanent physical disabilities and deformities, including drop foot, severe limp and a severed nerve, as well as the following damages:

    a. pain and suffering, including mental anguish;

    b. loss of capacity to enjoy life;

    c. annoyance and inconvenience;

    d.   emotional distress;

    e.   permanent injuries and impairment;

    f.   permanent scarring and disfigurement;

    g.   past and future medical expenses;

    h.   past and future lost income and earning capacity;

    i.   past and future lost services, protection, care and assistance; and,

    j.   other damages incurred as a result of Defendants' conduct.

20. Additionally, Mrs. Davis has lost the society and companionship of her husband, Mr. Davis.

## COUNT I
### (Deliberate Intent – GCS)

21. Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1 through 20 of this Complaint as if set forth herein verbatim.

22. At all relevant times during his employment with GCS, Mr. Davis was a West Virginia resident working from a base of operations in Hurricane, Putnam County, West Virginia. At all relevant times, Mr. Davis lived in West Virginia, worked primarily out of West Virginia, was paid in West Virginia, paid West Virginia payroll taxes, and was entitled to (and continues to receive) West Virginia workers' compensation benefits.

23. As Mr. Davis is entitled to West Virginia workers' compensation benefits, the limitations of those benefits, and any immunities conferred thereby, are governed by West Virginia law; specifically, W. Va. Code § 23-4-2.

24. On and prior to October 28, 2021, GCS violated W. Va. Code § 23-4-2(d)(2)(B), in that:

(i) a specific unsafe working condition existed in the workplace which presented a high degree of risk and a strong probability of serious injury or death;

(ii) GCS, prior to the injury, had actual knowledge of the existence of the specific unsafe working condition and of the high degree of risk and the strong probability of serious injury or death presented by the specific unsafe working condition;

(iii) the specific unsafe working condition was a violation of a state or federal safety statute, rule or regulation, whether cited or not, or of a commonly accepted and well-known safety standard within the industry or business of the employer which rules, regulations and standards were specifically applicable to the work and working condition involved, and were intended to address the specific hazard(s) presented by the alleged specific unsafe working condition;[1]

(iv) notwithstanding the existence of the facts set forth in subparagraphs (i) through (iii), inclusive, of this paragraph, the person or persons alleged to have actual knowledge under subparagraph (ii) nevertheless intentionally thereafter exposed an employee to the specific unsafe working condition; and

(v) Mr. Davis, upon information and belief, suffered a serious compensable injury[2] as defined in section one, article four, chapter twenty-three as a direct and proximate result of the specific unsafe working condition.

25. As direct and proximate result of GCS's acts and omissions, Mr. Davis suffered the injuries described herein which, upon information and belief, exceed 13% whole person impairment.

---

[1] As it pertains to the alleged violations upon which plaintiff avers will prove element (c) of his claim, please see the verified statement of Jim McIntosh, an OSHA safety standards expert specializing in pipeline safety statutes, rules, regulations and consensus industry safety standards, served with the *Complaint*.

[2] As of the date of the *Complaint*, independent medical examiner Dr. Syam Stoll has determined that Mr. Davis has not yet reached maximum medical improvement ("MMI") with regard to his leg injuries. As a result, while Mr. Davis has not received a 13% WPI rating, Plaintiffs anticipate that this rating is forthcoming given the nature of Mr. Davis' injuries.

## COUNT II
### (Negligence – Dr. Pepper)

26. Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1 through 25 of this Complaint as if set forth herein verbatim.

27. As the owner, operator and controller of the Plant, and due to its active participation in the work being performed by both its own employees and those of GCS on October 28, 2021, Dr. Pepper had a duty to exercise reasonable care in the provision of safety equipment and otherwise ensure that the Plant was a safe workplace for all workers therein.

28. Dr. Pepper, through its agents, servants, representatives and/or employees, negligently breached its duty to Mr. Davis through, among other actions, the following:

   a. Failing to ensure that the Stand it ordered fabricated was capable of supporting the Pump;

   b. Failing to provide workers, including Mr. Davis, with an additional fork lift, despite request, as a safety measure; and,

   c. Failing to provide a safe workplace free of hazards routinely controlled in the industry.

29. As a direct and proximate result of Dr. Pepper's actions and omissions on and before October 28, 2021, Mr. Davis sustained the injuries and damages described herein, and further caused Mr. Davis to suffer a permanent and substantial physical deformity pursuant to O.R.C. § 2315.18(B)(3)(a).

30. Furthermore, Dr. Pepper's acts and omissions demonstrate that it consciously disregarded the rights and safety of other persons, including Mr. Davis, in a manner that had a great probability of causing substantial harm, thus constituting actual malice pursuant to O.R.C. § 2315.21.

31. Punitive damages are justified to punish Dr. Pepper for its conscious disregard for Mr. Davis' safety, which resulted in severe and permanent injuries to Mr. Davis and a permanent burden on the rest of his life.

32. Punitive damages will serve to deter Dr. Pepper from continuing to defy basic safety standards, and from placing expediency and financial benefit ahead of basic minimal regard for human life, safety, and dignity, thus working to protect future workers from such outrageous and indifferent conduct.

## COUNT III
### (Strict Product Liability – Sterling)

33. Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1 through 32 of this Complaint as if set forth herein verbatim.

34. Sterling designed, manufactured, sold, distributed and/or marketed, the Stand, which was used by Mr. Davis and others in the manner for which it was designed, manufactured and marketed by Sterling.

35. The Stand was not reasonably safe from the time it was designed, manufactured and distributed until Mr. Davis sustained the severe and permanent injuries described herein during the reasonably foreseeable use of the Stand, insofar as it was inadequate to support the weight of the Pump it was allegedly designed to hold.

36. At all relevant times, Sterling knew that its customer and end users, including Mr. Davis, would rely on and trust the Stand, believing it would function as advertised. Additionally, Sterling knew that its customer and end users, including Mr. Davis, would use the Stand as Plaintiff did on October 28, 2021.

37. Upon information and belief, the Stand's inadequacy was based either (1) on defective design pursuant to O.R.C. § 2307.75, insofar as the Stand was not designed to support

9

the full weight of the Pump; or, (2) on defective manufacture pursuant to O.R.C. § 2307.74, insofar as the metal utilized to fabricate the Stand was flawed or otherwise failed to meet the specifications necessary, thus deviating in a material way from the design specifications, formula, or performance standards applicable thereto.

38. Additionally, upon information and belief, the Stand failed to advise end users, including Mr. Davis, of its capabilities or limitations, and/or failed to conform to representations made by Sterling, rendering it defective pursuant to O.R.C. §§ 2307.76–77.

39. As such, the Stand was defective and unsafe for its intended use, as it failed to perform as safely as an ordinary consumer and/or end user would expect when the Stand was used as intended and/or in a reasonably foreseeable manner.

40. Furthermore, the risk of danger in the design of the Stand outweighed any alleged benefits of the design. At the time the Stand left Sterling's control, safer alternative designs existed which would have made the Stand safer and would have prevented Mr. Davis from being injured without substantially impairing the Stand's utility. These safer alternative designs were economically and technologically feasible at all relevant times. Therefore, the Stand presented a substantial and unreasonable risk of serious injury to users and/or those in the vicinity of its use.

41. As a direct and proximate result of the defective design and/or manufacture of the Stand, and Sterling's failure to warn the end users, including Plaintiff, of the Stand's capabilities, Sterling is strictly liable to Plaintiffs for the injuries and damages described herein, and further caused Mr. Davis to suffer a permanent and substantial physical deformity pursuant to O.R.C. § 2315.18(B)(3)(a).

42. Furthermore, Sterling is subject to punitive damages pursuant to O.R.C. § 2307.80(A) insofar as it manifested a flagrant disregard of the safety of persons who might be

harmed by the Stand. At all relevant times, Sterling had actual or constructive knowledge of the risks inherent to the Stand, insofar as it fabricated a product inadequate for its precise purpose and failed to implement safety precautions or warn the end users, including Plaintiff of the risks associated with that defect. In sum, Sterling placed profit over safety and knowingly decided to forego safer, competent designs.

## COUNT IV
### (Negligence – Sterling)

43. Plaintiffs repeat and incorporate here by reference the allegations contained in paragraphs 1 through 42 of this Complaint as if set forth herein verbatim.

44. Sterling owed end users of the Stand, including Mr. Davis, a duty to exercise reasonable care in manufacturing, fabricating, designing, shipping, selling and/or distributing the Stand.

45. Sterling breached this duty and was negligent in the following acts or omissions:

   a. Sterling failed to properly design the Stand to support the weight of the Pump such that it would serve as an appropriate support for the Pump in the RO system, despite Sterling personnel inspecting the RO system and specifically designing the Stand for this precise purpose;

   b. Sterling negligently manufactured the Stand to be inadequate to support the Pump or, alternatively, negligently utilized inferior or inadequate materials to fabricate the Stand; and,

   c. Sterling failed to make reasonable inspections and tests to ensure that the Stand met the specifications and requirements for its explicit purpose or to otherwise discover the defects, dangers, and hazards presented by the Stand.

46. Sterling's negligence directly and proximately caused Mr. Davis' injuries as described herein, and further caused Mr. Davis to suffer a permanent and substantial physical deformity pursuant to O.R.C. § 2315.18(B)(3)(a).

47. Furthermore, Sterling's acts and omissions demonstrate that it consciously disregarded the rights and safety of other persons, including Mr. Davis, in a manner that had a great probability of causing substantial harm, thus constituting actual malice pursuant to O.R.C. § 2315.21.

48. Punitive damages are justified to punish Sterling for its conscious disregard for Mr. Davis' safety, which resulted in severe and permanent injuries to Mr. Davis and a permanent burden on the rest of his life.

49. Punitive damages will serve to deter Sterling from continuing to defy basic safety standards, and demonstrating minimal regard for human life, safety, and dignity, thus working to protect future workers from such outrageous and indifferent conduct.

## COUNT V
### (Breach of Warranties – Sterling)

50. Plaintiffs repeat and incorporate here by reference the allegations contained in paragraphs 1 through 49 of this Complaint as if set forth herein verbatim.

51. Sterling, at all times material hereto, both explicitly and by and through the sale of the Stand, expressly and impliedly warranted to end users, including Mr. Davis, through its actions, representations, promises, affirmations, promotions, product literature, photographs and promotional material, that the Stand Sterling designed, manufactured, sold, marketed and/or distributed was of such quality and reasonably fit for the purpose of serving as safe and suitable support for the Pump.

52. Additionally, Sterling, at all times material hereto, expressly and impliedly warranted to end users, including Mr. Davis, that the Stand was fit for the particular purpose for which it was allegedly designed, manufactured, sold, marketed and/or distributed; specifically, to support the Pump in the RO system at the Plant.

53. Mr. Davis relied on the express and implied warranties made by Sterling as described herein.

54. Sterling breached its express and implied warranties of fitness and merchantability by defectively designing, manufacturing, selling, marketing and/or distributing the Stand, which was not reasonably safe for its intended use as reflected throughout Sterling's actions, representations, promises, affirmations, promotions, product literature, photographs and promotional material.

55. Sterling's breach of warranties directly and proximately caused Mr. Davis' injuries as described herein, and further caused Mr. Davis to suffer a permanent and substantial physical deformity pursuant to O.R.C. § 2315.18(B)(3)(a).

## COUNT VI
### (Loss of Consortium – All Defendants)

56. Plaintiffs repeat and incorporate here by reference the allegations contained in paragraphs 1 through 55 of this Complaint as if set forth herein verbatim.

57. As a further direct and proximate result of the conduct and actions of the Defendants as described herein, Mrs. Davis has been deprived of the society, companionship and consortium of her husband, Mr. Davis.

58. Mrs. Davis further states that, as a result of Mr. Davis' injuries, she has incurred expenses, which sums shall be made more definite at the time of trial.

**WHEREFORE**, Plaintiffs demand judgment in an amount in excess of Twenty-Five Thousand and 00/100 Dollars ($25,000.00) against the Defendants, jointly and severally, for:

    a. an amount of compensatory damages determined by a jury;

    b. an amount of punitive damages determined by a jury;

    c. costs and attorney fees expended in prosecution of this matter;

      d.    pre-judgment and post-judgment interest as provided under the law; and

      e.    any and all other relief to which the Court deems plaintiff is entitled.

PLAINTIFFS DEMAND A JURY TRIAL ON THE ISSUES OF LIABILITY AND DAMAGES. PLAINTIFFS DEMAND A BIFURCATED JURY PROCEEDING ON THE ISSUE OF WORKERS' COMPENSATION OFFSET.

        **MATTHEW DAVIS and JEANETTE DAVIS,**

        **By Counsel,**

*/s/ David A. Bosak*
David A. Bosak (OH State Bar # 0099361)
BAILEY, JAVINS & CARTER, LC
213 Hale Street
Charleston, WV  25301
(304) 345-0346
dbosak@bjc4u.com